Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3743 | **DATE** | 2/8/2002 |
| **CASE TITLE** | Smith vs. American General Life and Accident Insurance Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Court grants defendant's motion for summary judgment as to all allegedly fraudulent representations except for the handwritten notations in the receipt book and grants defendant's motion for partial summary judgment on punitive damages [#42]. The Court denies plaintiff's motion for partial summary judgment [#44]. Status hearing is set for 3/4/02 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 2 number of notices | Document Number |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | FEB 11 2002 date docketed | 55 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | CDY docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 2/8/2002 date mailed notice | |
| MD | courtroom deputy's initials | MD mailing deputy initials | |

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| CAROLYN SMITH, | ) | **DOCKETED** |
| --- | --- | --- |
| Plaintiff, | ) ) ) | FEB 1 1 2002 |
| v. | ) ) ) | No. 99 C 3743 |
| AMERICAN GENERAL LIFE AND ACCIDENT INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Carolyn Smith, has brought suit against defendant, American General Life and Accident Insurance Company ("American General") on an insurance policy, alleging common law fraud (Count I) and violations of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2 (hereafter the "Consumer Fraud Act") (Count II) and the Illinois Insurance Code, 215 ILCS 5/155 (Count III). Defendant has moved for summary judgment on all claims and, in the alternative, for partial summary judgment on the punitive damages requests in Counts I and II. Plaintiff has moved for partial summary judgment as to liability on all claims. This court's jurisdiction is properly invoked under 28 U.S.C. § 1332.[1] For the reasons articulated below, the

---

[1] Plaintiff filed the underlying suit on April 29, 1999 in the Circuit Court of Cook County and American General was served on May 5, 1999. American General removed to this court on June 4, 1999. The complaint alleged compensatory damages, punitive damages and attorneys fees which, combined, exceeded $75,000. And although the court has granted summary judgment on the punitive damages portion of Counts I and II, thereby reducing the amount in controversy to below the requisite amount, this court's continued jurisdiction of what remains of plaintiff's claims is not precluded. *See Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 130 F.3d 290, 293 (7th Cir. 1997) (Diversity jurisdiction is "determined at the commencement of a suit in federal court.") (citing, *inter alia*, 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3702 at 28-32 (2d ed. 1985)); *Klepper v. First Am. Bank*, 916 F.2d 337, 340-41 (6th Cir. 1990) (Where summary judgment was

1

court grants in part and denies in part defendant's motion for summary judgment, grants defendant's motion for partial summary judgment on punitive damages, and denies plaintiff's motion for partial summary judgment.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of material fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.*, 477 U.S. at 324, 106 S. Ct. at 2553; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). On cross-motions for summary judgment, the court

---

granted on punitive damages, court properly retained jurisdiction over $5,000 claim for incidental damages and attorneys fees since jurisdiction had attached at time complaint was filed.).

2

must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## FACTS[2]

American General, is a Tennessee corporation licensed to do business in the state of Illinois. Plaintiff resides in Aurora, Illinois. In February of 1991, Daniel Cobb, an agent of American General, visited plaintiff's home to solicit applications for American General life insurance policies. On February 28, 1991, plaintiff applied for life insurance policies for three of her step-children, Tynisa, D'Right and Isaac. On March 27, 1991, American General issued life insurance policies on all three children. Isaac's policy, #191222933, insured his life for the face amount of $15,000.00 and required a monthly premium of $9.85 (Tynisa was issued policy #191222931 with a premium of $8.94 and D'Right was issued policy #191222932 with a premium of $12.15).

When plaintiff purchased the policies, American General gave plaintiff a receipt book that she kept in her possession. Every month, American General sent an agent to plaintiff's home to collect the premiums and during those visits the American General agent wrote the date and amount of each premium payment in her receipt book and initialed his entry. Plaintiff asserts that in September of 1992, she informed the American General agent that came to her house to

---

[2]Plaintiff's Response to Defendant's Local Rule 56.1 Statement fails to set forth any supporting citation to dispute defendant's facts as required by Local Rule 56.1(b)(3)(A) and, therefore, the court deems admitted facts in defendant's Local Rule 56.1 Statement not otherwise disputed by citations to the record in plaintiff's own Local Rule 56.1 Statement. *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (Unless controverted in the manner prescribed by the local rules, "all material facts set forth in the movant's statement are deemed admitted."). The court also notes that plaintiff's Response contains 32 paragraphs whereas American General's 56.1 Statement contains only 22 paragraphs. Those paragraphs that do not respond to any statement made by American General's 56.1 Statement are, therefore, disregarded.

3

collect premiums, that she would not be making further payments on D'Right's policy because he was old enough to take responsibility for himself. Plaintiff states, however, that she continued paying on Isaac's policy.[3] American General agrees that plaintiff said that she wished to cancel D'Right's policy, but that its records show that Isaac's policy #191222933 also lapsed with premiums paid only up to September 27, 1992 and that no premiums were credited for any month thereafter. Also, according to American General, on August 24, 1994, it issued another policy, #122192937, which insured Isaac for the face amount of $7,500.00.

Beginning in January, 1996, American General switched from handwritten receipt books to computer-generated receipts printed from a hand-held unit, which the agent brought when picking up the premium payments. Plaintiff asserts that she first learned of a change in Isaac's policy when she received her first computerized receipt and noticed that Isaac's policy had a new number and an increased premium. The copies of the computerized receipts submitted by plaintiff indicate that she was paying $11.59[4] (instead of $9.85) and the policy was now numbered #122192937 instead of #191222933. Plaintiff asserts that she paid the increased

---

[3] The notations in the receipt book submitted by plaintiff indicate that the total monthly amount charged for the three policies in the months from November, 1991 through October, 1992 was $30.94/month and that plaintiff paid that amount from November, 1991 through July of 1992, but that in August, 1992, $8.94 was paid (next to this notation is the statement "policy 191222931" and the name "P. Moore"), in September, 1992, $17.88 was paid, and in October, 1992, $29.55 was paid (next to this notation is the statement "payment made on 191222933" and the initials "BW"). The receipt book also reflects that from November, 1992 through August, 1993, the total monthly amount charged was $18.79 (except January - March, 1993 when $18.78 was charged and April, 1993 when $23.00 was charged) and plaintiff paid this amount. Next to the notation for November, 1992 is the statement "(TS & IS)" and the initials "BW." Plaintiff did not submit receipt book pages for September, 1993 through July, 1994. Receipt book pages for August, 1994 through August, 1995, show a monthly amount paid of $18.23, initialed "J. Franco"; for September, 1995, an amount paid of $20.54, initialed "J. Franco"; and for the months October, 1995 - January, 1996, an amount paid of $20.53, initialed "C. Zaucha." (*See* Pl.'s 56.1 Statement, Ex. C.)

[4] Although plaintiff asserts the computerized receipts show she was paying $17.88 for Isaac's policy, the receipts she submitted indicate that the $17.88 figure for January, 1996 refers to policy #191222931 (Tynisa's policy) and appears to be two months payment for that policy ($8.94 x 2). (*See* Pl.'s 56.1 Statement, Ex. C.)

premium from at least January, 1996 through August, 1997, while seeking to learn why she was paying more premium for the same policy. She states that she complained to a series of American General agents and that finally an American General supervisor visited plaintiff's home and informed her that she had applied for policy #122192937. He showed her a copy of the application for policy #122192937, that purported to have her signature. Plaintiff told him that the signature on the application was not hers and requested a copy of the application. The supervisor refused, but said he would send her a copy later. Plaintiff then showed the supervisor her receipt books in order to demonstrate her continued payment on the original policy for Isaac. She also asked why the premium had increased. The supervisor informed plaintiff that he would "check into" the problem and notify plaintiff of the result. The supervisor never sent plaintiff a copy of the application.

On September 4, 1997, Isaac died. American General received a claimant's statement for benefits under policy #122192937, signed by plaintiff and dated September 8, 1997. On September 25, 1997, American General paid $7,500.00 under policy #122192937 to plaintiff. Plaintiff, still believing Isaac was insured under #191222933, had expected payment of $15,000.00, the face amount of that policy, and not $7,500.00. She states that she learned for the first time while making the claim that the new policy had a benefit of only $7,500.00.

On February 26, 1998, an attorney for plaintiff contacted American General by letter, stating that as "best as [he] [could] determine, there was a prior policy in place under Policy No. 191222933 which carried a different face value from the policy on which the payment was made." (Def.'s 56.1 Statement, Ex. 3, Holland Aff., ¶ 3, Ex. A.) He requested that someone contact him to discuss the difference in the two policies and their status. (*Id.*) One of American

General's customer service representatives responded by letter on March 18, 1998, stating, *inter alia*, that policy #191222933 "with a face amount of $15,000, lapsed with premiums paid to September 27, 1992 and the policy had no value on the date of death" and that "Policy 122192937 was issued August 24, 1994 with a face amount of $7,500." (*Id.*) The letter also states: "If you have evidence that disagrees with the information shown in our records, please provide copies for our review and consideration." (*Id.*)

American General heard nothing from plaintiff until nearly a year later when her current attorney, Gary D. McGuane, sent a letter dated February 3, 1999 to American General. In that letter, he refers to plaintiff's receipt books and attempts to refute American General's claim that policy #191222933 had lapsed in September, 1992. He also suggests that American General's agents may have "mistakenly" canceled policy #191222933, but by the time they discovered their mistake, the premium rates had increased, such that they could not replace the original policy with a policy for a like amount of coverage or rates and so they "forged" plaintiff's signature and "defrauded" her of "additional premium payments for a policy with half the value." (*Id.*) Plaintiff asserts that American General still refused to pay her claim, and thus she agreed to pay McGuane a contingency fee for subsequent services.

On February 16, 1999, American General sent a letter to McGuane, stating that American General was "in the process for getting all the files together for review" and that these will be given to a Technical Examiner and "full review will be given of all the information sent." (*Id.*) Subsequently, in a letter dated March 5, 1999, an American General manager, Lois Holland, wrote to McGuane indicating she had received a copy of his letter, stating:

Prior to your letter, we were not aware of any problem in the lapse of an older

policy and issuance of the new one.

We had previously received an inquiry from another attorney regarding payments made and value and provided that information. We do not have a record of receiving further inquiry.

Due to the statements made in your letter, this certainly requires additional investigation and we will determine what information we can concerning this matter and advise.

We will attempt to resolve this matter as quickly as possible.

(*Id.*) On March 17, 1999, Holland wrote again to McGuane, this time in response to his telephone request, stating that she was enclosing a copy of the application for insurance signed on August 16, 1994 (for policy #122192937). She further stated: "We have requested that we be provided some sample signatures of this application to verify the circumstances surrounding the completion of this application." (*Id.*)

Plaintiff asserts that after McGuane received a copy of the application for policy #122192937, he pointed out the errors in that application (the incorrect spelling of Isaac's name, wrong social security number, and that Isaac's signature appeared to be forged)[5] to American General, but that American General still refused to pay her claim on the original policy. McGuane then sent a letter, on March 22, 1999, to Holland attaching a writing exemplar of Isaac's signature, and pointing out the dissimilarities between the two signatures as well as the other errors. (*Id.*) On March 25, 1999, Holland responded to McGuane in a letter stating that, "Based on our review of your letters and our file, we offer to pay an additional $7,500.00 which

---

[5]The application for policy #122192937 shows Isaac's name spelled "Isacc T. Smith," the premium amount is $11.59, the face amount is $7,500, and it purports to be signed by Isaac and not plaintiff. Also, Isaac's social security number is listed as #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 (whereas the application for policy #191222933 listed his social security number as #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). The agent listed on the application is "Johnny Franco." (*See* Pl.'s 56.1 Statement, Ex. E.)

7

will make settlement for the original amount applied for on the life of Mr. Smith." (*Id.*)
American general paid that amount plus 6% interest calculated from the date of Isaac's death, for a total of $8,226.00, to plaintiff, on March 26, 1999.

Plaintiff paid her attorney $2,500.00 for his efforts in collecting the amount due plaintiff under the original policy. On all three counts, plaintiff seeks compensatory damages (the difference between the premiums paid for policy #122192937 and policy #191222933, as well as the $2,500.00 contingency fee paid to her attorney), punitive damages, and attorney's fees and costs for bringing this suit.

## DISCUSSION

Defendant moves for summary judgment on Counts I through III and, in the alternative, requests partial summary judgment on plaintiff's claims for punitive damages under Counts I and II. Plaintiff moves for partial summary judgment as to liability and compensatory damages on Counts I through III, but requests that the court reserve the issue of punitive damages on each count for trial.

### I.    Count I – Common Law Fraud

In Count I, plaintiff brings a claim for common law fraud. To establish a claim for fraudulent misrepresentation under Illinois law,[6] plaintiff must demonstrate (1) a false statement of material fact by the defendant, (2) defendant's knowledge or belief that the statement was false, (3) defendant's intent to induce the plaintiff to act, (4) the plaintiff's reliance on the truth of

---

[6]The parties have not raised or addressed the choice of law issue and both rely on Illinois law in their briefs. Therefore, the court presumes that the substantive law of Illinois governs. *Kritikos* v. *Palmer Johnson, Inc.*, 821 F.2d 418, 421 (7th Cir. 1987) ("When the parties fail to consider the choice of law in a diversity case, the substantive law of the forum is presumed to control.") (quotation omitted).

8

*Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 479 n.5 (7th Cir. 1997) (citing *Bd. of Educ. of City of Chicago v. A, C and S, Inc.*, 131 Ill. 2d 428, 546 N.E.2d 580, 591 (Ill. 1989)).

Plaintiff claims she is entitled to summary judgment because she has proved all of these elements with respect to the following representations:

> (a) the entries in her receipt book reflecting premiums paid after the agent ceased sending those premiums to American General;
>
> (b) the application for the substitute policy shown to plaintiff by American General's supervisor purporting to be signed by plaintiff;
>
> (c) the application for the substitute policy sent by American General to plaintiff's counsel, McGuane, bearing the forged signature of Isaac;
>
> (d) the computerized receipts indicating plaintiff owed increased premium for coverage for Isaac.

Defendant responds that plaintiff is not entitled to summary judgment, and further contends that it is entitled to summary judgment because plaintiff has failed to put forward any evidence of reliance or damages as a result of any alleged misrepresentations.

The court concludes that defendant is entitled to summary judgment with respect to three of the alleged representations – (b), (c), and (d). The two applications for the "substitute" policy, policy #122192937, purport to represent that plaintiff and/or Isaac applied for a new policy with a higher premium and less coverage. Although plaintiff has submitted evidence that these representations are false in that neither she nor Isaac applied for this policy, the undisputed evidence is that plaintiff did not rely on these representations (nor did such reliance cause her damages).

Defendant points out that plaintiff testified that if she had known earlier that the original policy was not in effect she would have done the "same thing [she] had done when [she] found

9

out that it wasn't the correct amount" which was to "try[] to straighten it out" (*see* Def.'s 56.1 Statement, Ex. 1, Smith Dep. at 89), and argues that this testimony establishes that plaintiff did not rely on any alleged misrepresentations. Although plaintiff's answer to this hypothetical question would not, by itself, warrant this court granting defendant summary judgment on representations (b) - (d), plaintiff's other statements in the record do. Plaintiff's affidavit indicates that either she or her attorney had knowledge of the "falsity" of these representations (i.e. they didn't represent what she had signed up for on the original policy) from the moment they were made. With respect to the computerized receipts, when plaintiff "received her first computerized receipt, it showed a new policy number . . . different from the original and an increased premium," which she paid "beginning in January, 1996, even while seeking to learn . . . why she was paying more for the same policy." (Pl.'s 56.1 Statement, ¶¶ 14-15.) As for the application allegedly shown to her by defendant's supervisor, which purported to bear plaintiff's signature, plaintiff told the supervisor "the signature on the application was not hers." (*Id.*, ¶ 18.) And the application sent to plaintiff's attorney, which purported to bear Isaac's signature, "clearly demonstrated that the application was a forgery" and plaintiff's attorney "pointed these obvious errors out to American General." (*Id.*, ¶¶ 31, 35.) Because this evidence demonstrates plaintiff's knowledge of the "falsity" of these representations, there can be no reliance on the truth of them, nor could such reliance have caused her damages. Alternatively, these representations cannot be deemed material since there is no basis to conclude that had plaintiff known them to be false, she would have acted differently than she did when she was first presented with the representations. *See Mack v. Plaza Dewitt Ltd. Partnership*, 137 Ill. App.3d 343, 484 N.E.2d 900, 906 (1st Dist. 1985) ("A misrepresentation is 'material' and therefore

actionable if it is such that had the other party been aware of it, he would have acted differently.") (internal citations omitted).[7]

However, with respect to the entries in the receipt book, (a) *supra*, plaintiff has put forward enough evidence to withstand summary judgment. Although defendant disputes the meaning of the various notations in the receipt book, plaintiff has at least raised a question of fact as to whether these entries purport to represent that plaintiff owed $9.85 for Isaac's original policy. Further, there is evidence that these representations were false because, according to American General's internal records, the policy "lapsed" in September, 1992, and was later replaced by policy #122192937 with a higher premium of $11.59. Because the original policy had "lapsed," no premiums should have been due. There is also evidence from which it can be inferred these representations were "knowingly" false and that defendant's agents intended plaintiff to rely on them. Namely, if no premiums were being credited to policy #191222933, yet plaintiff continued to pay premiums, the question arises "Where did the premiums go?" and raises the inference that one or more of the agents collecting the premiums ("BW" and/or "J. Franco") knew the entries were false and intended plaintiff to rely on them in order to keep her paying.[8] Also, as pointed out by plaintiff, a strong inference is raised that one of the agents (presumably the agent whose name appears on the substituted application – Johnny Franco, if he is the same agent whose initials appear in the receipt book as "J. Franco") continued to collect the premiums on the original policy even after he filled out the application with the higher

---

[7]Also, with respect to the application purportedly signed by Isaac, according to plaintiff's chronology of the facts this application was sent to her attorney after she had already agreed to pay him a contingency fee, and thus could not have induced any reliance (or been material to) her decision to pay the contingency fee.

[8]On the other hand, as argued by defendant, the disappearance of the premiums could be due to an "innocuous bookkeeping error."

11

premium and, as such, is further evidence that he knew the representations to be false.

Moreover, unlike representations (b) - (d), plaintiff has presented evidence that the written receipt book entries were material, that she relied on the truth of these representations, and that such reliance caused her damages. According to plaintiff, American General agents continued to come to her house to collect premiums and make entries in her book indicating an amount due on policy #191222933, even after that policy purportedly lapsed, and she paid them. (Pl.'s 56.1 Statement, ¶¶ 8-10; *see also* footnote 3 herein.) Because of her belief in the truth of these entries, she also paid the higher premium when the computerized receipts were issued, because she thought the original policy was in effect. (*See* Pl.'s 56.1 Statement, ¶ 15.) And she paid her attorney a contingency fee because she believed she was entitled to the benefits under the original policy. (*Id.* ¶ 38.) Therefore, defendant is not entitled to summary judgment on the common law fraud claim with respect to the receipt book entries.[9] However, because there are issues of fact with respect to this claim, as has been noted, neither is plaintiff entitled to summary judgment.[10]

---

[9] Defendant's argument that plaintiff's claim should fail because there were no damages at all because it paid the $15,000.00 face amount of the original policy plus interest is without merit. There is still the issue of the difference between the premiums (an amount the parties dispute) and the amount paid to her attorney. *See Calcagno v. Personalcare Health Mgmt., Inc.*, 207 Ill. App. 3d 493, 565 N.E.2d 1330, 1339 (4th Dist. 1991) ("Attorney's fees, at least to the extent that they were not incurred in the same action in which they are awarded, may be recovered under the common law as an element of compensatory damages in cases where the defendant's tortious conduct proximately caused the plaintiff to incur them.") (citations omitted); *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 274 (7th Cir. 1996).

[10] As defendant also points out, it is plaintiff's burden to prove that defendant, the corporation, is responsible for the acts of its agents. *See Yugoslav-American Cultural Ctr., Inc. v. Parkway Bank and Trust Co.*, 289 Ill. App. 3d 728, 682 N.E.2d 401, 406 (1st Dist. 1997) ("Apparent authority arises when an organization holds an agent out as possessing the authority to act on its behalf, and a reasonably prudent person, exercising diligence and discretion, naturally assumes the agent has this authority in light of the organization's conduct."); *Wabash Indep. Oil Co. v. King & Wills Ins. Agency*, 248 Ill. App. 3d, 618 N.E.2d 1214, 1217-18 (5th Dist. 1993). Plaintiff has at least raised an issue of fact with respect to this issue to go to trial, however.

## II. Count II – Consumer Fraud Act

In Count II, plaintiff brings a claim under the Illinois Consumer Fraud Act. The Act prohibits, *inter alia*, "misrepresentation . . . of any material fact" in the conduct of trade or commerce. 815 ILCS 505/2 (West 2000). To establish a claim under the Act, plaintiff must show: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001) (citing *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 675 N.E.2d 584, 593 (Ill. 1996)). Although the requirements under the Act are more liberal in that neither knowledge on the part of defendant of the falsity of the representation (an innocent misrepresentation will do) nor actual reliance by the plaintiff is required, *see Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997), plaintiff still must prove that the representation was material and proximately caused her injuries. *Cozzi*, 250 F.3d at 576 (citing *Connick*, 174 Ill. 2d 482, 675 N.E.2d at 593); *Mack*, 137 Ill. App. 3d 343, 484 N.E.2d at 906 ("[B]oth statutory and common law fraud require proof of a misrepresentation of a material fact.") (citation omitted).

Because plaintiff has failed to show that there is an issue of fact with respect to materiality or causation regarding representations (b) - (d), her claim with respect to these representations fails under the Act. However, because the court has found that there is sufficient evidence to withstand summary judgment on her common law fraud claim with respect to representation (a), that evidence is also sufficient to survive summary judgment under the Act

13

with regard to representation (a).[11]

### III. Count III – Vexatious Delay

In Count III, plaintiff brings a common law claim for compensatory damages for unreasonable and vexatious delay to recover the $2,500.00 plaintiff paid to her attorney to collect the remaining $7,500.00, as well as for additional costs under the Illinois Insurance Code.[12] Under the Code, the court may award,

> as part of the taxable costs in the action [of plaintiff against defendant for an unreasonable delay in settling a claim] reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts: (a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs; (b) $25,000; (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action

where "it appears to the court that such action or delay is vexatious and unreasonable." 215 ILCS 5/155 (West 2000). "Whether the insurer's acts are 'unreasonable and vexatious' within the meaning of section 155 is a question of fact, which is discretionary with the trial court." *Green v. Int'l Ins. Co.*, 238 Ill. App. 3d 929, 605 N.E.2d 1125, 1129 (2d Dist. 1992). A plaintiff cannot prevail merely by showing "an insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and without reasonable

---

[11]Plaintiff also appears to include one additional representation under the Act that she did not mention with respect to the fraud claim, which is that the representations made to her by defendant's agents that her policy had "lapsed," even if innocent, are actionable. (*See* Pl.'s Mem. In Support of Mot. For Partial Summ. J., at 12.) However, because the evidence detailed in the text with respect to representations (b) - (d) also suggests she did not believe the truth of any of the statements that her original policy had lapsed, and that is why she pressed forward, these "false" representations fail to qualify as material or to be the cause of her damages.

[12]The additional costs under the Illinois Insurance Code would not include the $2,500.00 as compensatory damages under the common law vexatious refusal claim. *Calcagno*, 207 Ill. App. 3d 493, 565 N.E.2d at 1339 (Attorneys fees that are part of compensatory damages "may not be recovered as part of the 'reasonable attorney fees' referred to in section 155.").

14

cause." *Citizens First Nat'l Bank of Princeton* v. *Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (citing *Morris* v. *Auto-Owners Ins. Co.*, 239 Ill. App. 3d 500, 606 N.E.2d 1299, 1305 (1993)). An insurer's conduct is not "vexatious and unreasonable" if, *inter alia*, "there is a bona fide dispute concerning the scope and application of insurance coverage" or "the claim presents a genuine legal or factual issue regarding coverage." *Id.* (citing *Green*, 238 Ill. App. 3d 929, 605 N.E.2d at 1129); *see also Horning Wire Corp.* v. *The Home Indem. Co.*, No. 91 C 6694, 1993 WL 11850, *7 (N.D. Ill. Jan. 14, 1993) ("Delays which result from investigation to resolve genuine legal and factual issues regarding insurance coverage are generally not considered vexatious or unreasonable.") (citing, *inter alia, Dark* v. *United States Fidelity & Guar. Co.*, 175 Ill. App. 3d 26, 529 N.E.2d 662, 666 (1st Dist. 1988)).

Plaintiff contends she is entitled to summary judgment because it was unreasonable for defendant not to pay in full once plaintiff provided defendant, in early February, 1999, with the copies of her receipt books and computerized receipts. Defendant argues it is entitled to summary judgment because the delay in paying the $15,000.00 resulted from its investigation to resolve a genuine issue regarding insurance coverage and there is no evidence of unreasonable conduct.

The record shows defendant paid initially on policy #122192937 in September, 1997 because the claimant's statement, which plaintiff signed, requested benefits under policy #122192937. Then when plaintiff's first attorney contacted defendant on February 26, 1998 to notify it of a potential problem, defendant responded to plaintiff's counsel, three weeks later, on March 18, 1998, explaining that its records reflected policy #191222933 had lapsed, and asking plaintiff to submit additional information if she disagreed. There is nothing in plaintiff's

15

counsel's February 26, 1998 letter suggesting plaintiff had been continuing paying premiums on the original policy and thus that defendant should have assumed she had. Plaintiff did not respond until nearly a year later when her second attorney, McGuane, contacted defendant on February 3, 1999, attaching copies of the receipt book pages and a very detailed letter. To this, defendant responded within two weeks, on February 16, 1999, and also contacted McGuane independently on March 5, 1999 to notify him of the investigation. After McGuane provided exemplars of Isaac's signature, on March 22, 1999, defendant paid on the original policy in full, with interest, just four days later, on March 26, 1999.

Plaintiff argues that once McGuane sent the February 3, 1999 letter, defendant should have paid immediately, based on the fact that plaintiff had shown a supervisory employee her receipt books in January 1996 and that plaintiff submitted the receipt books with the February, 1999, letter. However, not only is there no evidence that this "supervisor" is the corporation for purposes of imputing his knowledge to the corporation (*see* discussion, below, regarding defendant's motion for partial summary judgment on punitive damages), but the evidence shows that in light of defendant's internal records showing that policy #191222933 had lapsed, an investigation was warranted, and defendant began undertaking an investigation as soon as plaintiff sent the February 3, 1999 letter. Plaintiff also argues defendant continued to assert policy #122192937 as a defense even after McGuane pointed out the inconsistencies in the application for that policy: plaintiff suggests defendant could have checked the apparently forged application for policy #122192937 against the application for policy #191222933. However, a comparison of the two would not *per se* have revealed a forgery since the application for policy #191222933 was signed by plaintiff not Isaac. It was not unreasonable for Holland to wait for

writing exemplars to confirm those inaccuracies. Defendant paid only four days after receiving the exemplars. Therefore, the facts on record do not demonstrate that defendant vexatiously or unreasonably delayed in settling plaintiff's claim under the original policy once it had information that showed both that plaintiff had been paying on the original policy (the receipts) and that the signature on the application for the second policy purporting to have been signed by Isaac was shown to be inaccurate by comparison to writing exemplars. Because the delay, therefore, resulted from a bona fide dispute about coverage and defendant's investigation to resolve that dispute was not unreasonable, the court grants summary judgment to defendant on Count III.

## IV. Motion for Partial Summary Judgment on Punitive Damages (Counts I & II)

Because at least one set of representations (the handwritten receipt book entries) remain viable in Counts I and II, the court now addresses defendant's alternative motion for partial summary judgment on plaintiff's request for punitive damages under Counts I and II. In Illinois, punitive damages may be awarded for acts of "gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness.'" *Roboserve, Inc.*, 78 F.3d at 275 (quotation and internal quotation omitted); *see also Loitz* v. *Remington Arms Co.*, 138 Ill. 2d 404, 563 N.E.2d 397, 402 (Ill. 1990). However, "the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished in those cases in which liability is imposed vicariously." *Mattyasovszky* v. *West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509, 512 (Ill. 1975). As such, punitive damages can only properly be awarded against a corporation because of an act by an agent if the corporate principal was somehow complicit in the agent's acts. *Kennan v. Checker Taxi Co., Inc.*, 250 Ill. App. 3d 155, 620 N.E.2d 1208, 1212-13 (1st

Dist. 1993). While the measurement of punitive damages is a jury question, the question of whether the facts of a particular case justify the imposition of punitive damages is a question of law. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 384 N.E.2d 353, 359 (Ill. 1978).

Punitive damages on a corporation for the acts of its agents are limited to the specific circumstances set forth in the Restatement (Second) of Agency 217C (1958): "(a) The principal authorized the doing and the manner of the act, or (b) the agent was unfit and principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of his employment, or (d) the principal or a managerial agent of the principal ratified or approved the act." *Kennan*, 250 Ill. App. 3d 155, 620 N.E.2d at 1211 (citing *Mattyasovszky*, 61 Ill. 2d 31, 300 N.E.2d 509).

Plaintiff asserts that defendant has "throughout this litigation alleged a scheme to defraud initiated by defendant's agents, but later concealed, joined in and taken advantage of by American General itself." (Pl.'s Resp. to Def.'s Mot. Summ. J., at 3.) Plaintiff bases her claim for punitive damages against defendant on the latter two provisions mentioned in *Kennan*. Plaintiff argues the supervisor with whom she spoke after she noticed she was paying a higher premium showed her a copy of an application for a different policy that purported to have her signature. The court has already concluded that the "falsity" of the allegedly forged application was not material to her fraud claims. Moreover, plaintiff has put forward no evidence that this supervisor (whom she does not name), acted in a managerial capacity in ratifying the actions of defendant's agents for purposes of imposing corporate liability. *See Abshire v. Stoller*, 235 Ill. App. 3d 849, 601 N.E.2d 1257, 1263 (1st Dist. 1992) (finding no evidence that agent was manager under definition in *Kemner v. Monsato Co.*, 217 Ill. App. 3d 188, 576 N.E.2d 1146 (5th

18

Dist. 1991) as one who "formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of whether a policy should be adopted" or under the definition in *Adams* v. *Zayre*, 148 Ill. App. 3d 704, 499 N.E.2d 678 (2d Dist. 1986) as one who directed "any department within the corporation."). Thus, any acts or ratification of acts by the supervisor cannot be attributed to the corporation for punitive damages purposes. Plaintiff also argues corporate involvement by way of Holland with whom plaintiff and/or her attorney contacted in 1999. However, not only is there no evidence that Holland was aware, prior to that time, of the handwritten entries (the only representations that survive summary judgment), but the evidence is that once she was made aware of them, she sought to rectify the situation promptly. Because plaintiff has failed to bring forward evidence of corporate complicity to hold defendant liable for punitive damages, the court grants defendant's motion for partial summary judgment on Counts I and II.

## CONCLUSION

For the above-stated reasons, the court grants defendant's motion for summary judgment as to all allegedly fraudulent representations except for the handwritten notations in the receipt book and grants defendant's motion for partial summary judgment on punitive damages [#42]. The court denies plaintiff's motion for partial summary judgment [#44]. The parties are strongly encouraged to settle this case. Status is set for March 4, 2002.

Date: February 8, 2002　　　　　　　　　　　　　Enter: _____
　　　　　　　　　　　　　　　　　　　　　　　　JOAN HUMPHREY LEFKOW
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge